

FILED

October 11, 2017

TN COURT OF
WORKERS'
COMPENSATION
CLAIMS

Time 3:03 P.M.

## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT MEMPHIS

| | | |
|---|---|---|
| **ANTHONY TERRY,** | ) | **Docket No. 2016-08-1054** |
| **Employee,** | ) | |
| | ) | |
| **v.** | ) | **State File No. 73704-2016** |
| **WHALEY'S TOWING,** | ) | |
| **Uninsured Employer.** | ) | |
| | ) | **Judge Allen Phillips** |

---

## EXPEDITED HEARING ORDER FOR MEDICAL BENEFITS

---

Anthony Terry claimed he fell on a tow truck owned by Whaley on July 27, 2016, and requested medical and temporary disability benefits. Mr. Terry asserted he was Whaley's employee; Whaley contended Mr. Terry was an independent contractor and questioned whether the injury occurred. The Court conducted an Expedited Hearing on September 27, 2017, and based on the evidence submitted holds Mr. Terry was Whaley's employee on the date of injury, that he came forward with sufficient proof of his injury, and that he is entitled to some of the requested medical benefits.

### History of Claim

Mr. Terry drove a tow truck for Whaley. He claimed he fractured his right leg and hip when he fell on the deck of a "rollback[1]" truck. The legal issues involved the employment relationship and the circumstances of the injury itself.

### *Employment relationship*

Mr. Terry worked for Whaley for several months. He kept a Whaley truck at his home and responded to service calls for tows and tire repairs. Generally, a Whaley dispatcher would contact Mr. Terry by text message to provide the location and nature of a call and an estimate of the time needed to complete it. Mr. Terry could then contact the

---

[1] A "rollback" tow truck uses an inclined deck to load and transport vehicles.

1

customer, or the customer's insurance carrier, if he needed to adjust his arrival time or modify the fee because of what he found at the scene.[2]

Mr. Terry said he remained "on-call 24/7," and, based on his experience, "all wrecker companies do it" that way. He said he had to accept all dispatched accident calls or face termination, but he admitted to rejecting some non-accident assignments because of personal reasons. Regardless, he believed Whaley could terminate him at any time.

Mr. Terry said he never performed towing work on his own with a Whaley truck, and any other work he did during his Whaley's tenure was "not [a] per se job, [but] somebody [might] bring by a car and I would fix it for them." He disputed that Whaley's proffer of an advertisement for mechanic services that bore his name proved he had his own repair business, but he explained the ad actually promoted his son's business. That same son helped him with Whaley assignments on a few occasions, but otherwise Mr. Terry felt bound to request that other Whaley drivers help him if needed.

Mr. Terry's compensation was thirty percent of the tow fees. Copies of checks placed into evidence were for various amounts, but each stated the payment was for "contract labor." Mr. Terry said he simply cashed the checks and did not know what "contract labor" meant. He believed he and the other drivers were employees, just as he believed three "girls in the office" and a "shop manager" were employees.

David Whaley, the owner of Whaley's Towing, countered Mr. Terry's assertions. Mr. Whaley contended all of his drivers were independent contractors and he paid them that way; their commissions were clearly marked on the checks as "contract labor." He explained it was within the driver's control of how to make the calls and perform the work. They were not required to work only for him, and they could utilize any helper they wanted. His drivers were "their own boss" and most, if not all drivers at the time of the accident, had other jobs, such as firefighting and delivering appliances. He had "probably" fourteen drivers at the time and maintained "files" on them not because they were employees, but because "Federal" regulations required he keep records of driver's licenses and "health cards" for commercial vehicle operators.

Mr. Whaley produced text messages that indicated Mr. Terry did mechanic work for others at the same time he worked for Whaley. Further, he said Mr. Terry told him that he helped his son with mechanic work and Mr. Terry performed some mechanic work for Mr. Whaley during the time he drove his tow trucks.

Mr. Whaley's testimony was consistent with Mr. Terry's to the extent that his dispatchers called or texted the drivers with assignments. He confirmed the dispatchers told the drivers of the fee, the "time out," and the nature of the call. He confirmed Mr.

---

[2] For example, the tow might require the use of special equipment that would add to the cost.

Terry's testimony that the driver might have to adjust times and fees depending upon the circumstances.

Jerry Barham testified he was the longest-tenured driver for Whaley and believed he was an independent contractor. Whaley pays him by commission, and at the outset of his relationship with Whaley, Mr. Barham owned his own tow truck and actually competed with Whaley.

*Accident*

As to the accident, Mr. Terry testified Whaley dispatched him to a tire repair call where he found a car with two blown tires. He determined the car would need to be loaded onto the rollback truck and started pulling the tow cables from the truck. Seeing he needed more cable, he stepped onto the bed of the truck, slipped and fell.

Teresa Grant, the owner of the car, testified by deposition. She said the tow truck driver came to her work and began attaching tow cables to her car. She went inside her office and later returned to find the driver lying on the ground yelling for help. He said he thought he broke his leg. She called an ambulance. Ms. Grant noted that the driver exhibited no signs of physical problems when he arrived and that he arrived alone. She confirmed she did not see the fall.

Whaley contested the occurrence of the event by producing a text message from Mr. Terry saying, "I'll go try [to do the call but] I'm down in my back" after falling off his porch the night before. Mr. Terry described twisting his back when he fell from the porch, and he specifically denied injuring his leg or hip. The date and time of the text message is unclear.

Chelsea Pruitt was a dispatcher at Whaley and saw Mr. Terry the morning of the incident. He was limping about the office so severely that she thought he should go home. His son was with him, and Mr. Terry told her that his son might help him to make any service calls. She confirmed on cross-examination that Mr. Terry's text message mentioned only that Mr. Terry injured his back in the fall from the porch.

Whaley also introduced evidence that Mr. Terry had a history of criminal convictions for theft and that he had made claims against other employers for falls that it argued were questionable. It produced an affidavit from an alleged former employer who said Mr. Terry made a false injury claim. Mr. Terry disputed that he had worked for that individual, but instead he worked for the affiant's father. He denied prior injuries to his right leg and hip.

3

The ambulance transported Mr. Terry to Methodist Hospital where he underwent surgery to repair fractures to his right leg and hip. He claimed his injury was so obvious that it required no medical proof. He has not worked since the date of the accident but placed neither medical bills nor records detailing his missed time into evidence.

## Findings of Fact and Conclusions of Law

### Standard applied

Mr. Terry must come forward with sufficient evidence from which the Court can determine he is likely to prevail at a hearing on the merits. Tenn. Code Ann. § 50-6-239(d)(1) (2016).

### Employee vs. Independent Contractor

Tennessee Code Annotated section 50-6-102(12)(D)(i) directs the Court to consider the following factors when determining whether an individual is an employee or an independent contractor:

(a) The right to control the conduct of the work;
(b) The right of termination;
(c) The method of payment;
(d) The freedom to select and hire helpers;
(e) The furnishing of tools and equipment;
(f) Self-scheduling of working hours; and
(g) The freedom to offer services to other entities[.]

However, these factors are not absolutes, but merely a means of analysis. *Thompsen v. Concrete Solutions*, 2015 TN Wrk. Comp. App. Bd. LEXIS 3, at *15 (Feb. 10, 2015). Moreover, no single aspect is conclusive, but instead "the trier of fact must examine all relevant factors and circumstances" of the relationship. *Boruff v. CNA Ins. Co.*, 795 S.W.2d 125, 127 (Tenn. 1990). If Mr. Terry establishes the existence of an employment relationship under these factors, then it becomes Whaley's burden to prove he was an independent contractor. *Galloway v. Memphis Drum Serv.*, 822 S.W.2d 584, 586 (Tenn. 1991). The Court will examine the statutory criteria in turn.

### (a) Right of control

The Appeals Board characterized the right to control the conduct of the work as the most significant factor when determining whether one is an employee or independent contractor. *Peters v. Jonathan Mitchell,* 2016 TN Wrk. Comp. App. Bd. LEXIS 7, at *9 (Feb. 8, 2016). "[T]he relevant inquiry [is] whether the right existed, not whether it was exercised." *Thompsen,* at *15.

4

In *Peters*, the Appeals Board found the employer "instructed [the employee] where and when to report to work" and provided him a "list of tasks" to perform. The employer in that case also provided a timeframe and ensured the assigned tasks were completed. *Peters*, at *9. Here, Whaley instructed Mr. Terry where his assignments were located and told him the nature of the job. It provided the timeframe in which he should perform the job and it maintained ultimate responsibility for the satisfaction of the customer. This control exercised by Whaley is dispositive, not the driver's control over the minutiae of hooking cables and moving cars. Thus, the Court finds this factor supports an employment relationship.

### *(b) Right of termination*

The power of an employer to terminate the employment at any time is incompatible with full control of the work as usually enjoyed by an independent contractor, and hence is a strong circumstance supporting an employment relationship. *Id.* at *10. Here, Whaley could have terminated Mr. Terry at any time, and he had no right to advance notice of termination and no employment contract. *Id.* at *11. The Court finds this factor supports a finding of an employment relationship.

### *(c) Method of payment*

The Court finds this factor supports a finding of an independent contractor relationship. The evidence establishes Mr. Terry did not receive a regular weekly wage like an employee but instead received a per-job payment like an independent contractor. The checks were all marked "contract labor." However, the method of payment does not control, even when it suggests an independent contractor relationship, when other factors strongly suggest a different characterization. *Starflight, Inc. v. Thoni*, 773 S.W.2d 908, 910 (Tenn. 1989). Here, the Court finds the other factors strongly support a different characterization.

### *(d) Freedom to select and hire helpers*

The Court finds this factor supports a finding that Mr. Terry was an employee. Mr. Terry testified he might have sought help from others but did not, apart from asking his son for help on occasion. Otherwise, he would have sought "helpers" from other Whaley drivers if he needed help. This arrangement appears to be conducting work in tandem with other employees rather than selecting one's own helpers to complete a task.

*(e) Furnishing of tools*

This factor strongly supports an employment relationship. Specifically, Whaley provided the tools of the trade, namely the trucks driven by Mr. Terry and the other drivers. Mr. Whaley testified he paid for fuel and routine maintenance.

*(f) Self-scheduling*

This factor supports an employment relationship. Whaley received and coordinated the service calls performed by Mr. Terry. Mr. Terry kept a Whaley vehicle at his home and worked only when dispatched to do so. He had no control over when, or if, Whaley might call him to perform work. Whaley instructed Mr. Terry when to appear for towing work and told him how long the service should take. *See Peters*, at *10.

*(g) Freedom to offer services to others*

The Court accredits Mr. Whaley's testimony that Mr. Terry and all other drivers might perform work for others. He explained that most of his drivers hold other jobs and Whaley did not bind them to specific, set hours.

However, the evidence also shows Mr. Terry remained in possession of Whaley's truck and was on call "24/7." Nothing in the proof indicates a different relationship between Whaley and the other drivers. The Court finds no evidence that any Whaley driver, as of July 27, 2016, *performed tow work for others*. To the contrary, the proof shows the drivers' other work was of a totally different nature.

In so finding, the Court considers Mr. Barham's testimony that he started working for Whaley when he might have been considered a "competitor." However, as noted, the Court finds no evidence that Mr. Terry or any other driver was working as a tow truck driver for himself or others as of the date of injury.

Based upon the statutory factors, the Court holds Mr. Terry came forward with sufficient evidence to show he would likely prevail at a hearing on the merits that he was an employee of Whaley.

*Medical benefits*

Under the Workers' Compensation Law, "the employer or the employer's agent shall furnish, free of charge to the employee, such medical and surgical treatment . . . made reasonably necessary by accident[.]" Tenn. Code Ann. § 50-6-204(a)(1)(A). Employers are also required to offer a panel of physicians "from which the injured employee shall select one (1) to be the treating physician." Tenn. Code Ann. § 50-6-204(a)(3)(A)(i).

6

At this interlocutory stage, the Court holds Mr. Terry would likely prevail at a hearing on the merits in proving a compensable injury. The medical records contain a diagnosis of a fractured hip, a description of a fall on a tow truck, and the specific treatment rendered for his injury. The only disinterested witness, Ms. Grant, testified Mr. Terry did not appear injured on the morning of the accident until she found him lying on the ground in obvious pain. She also noted he was alone; neither his son nor another helper was present in contravention of Whaley's proof.

The Court considered the challenges to Mr. Terry's credibility, both as to prior injury claims and his criminal record. It also notes Mr. Terry was a poor historian. However, under the burden he carries at this interlocutory stage, the Court finds his account of the injury the most believable. He admitted to having back pain from an incident at home, but the severity of a fractured hip is not compatible with his demonstrated abilities on the morning of his claimed fall.

Because Whaley denied the claim, Mr. Terry was forced to seek treatment on his own. Fairness requires that Mr. Terry need not change providers at this stage, and the Court finds it appropriate to designate Dr. Murrell, the treating surgeon, as the authorized treating physician. Mr. Terry produced no evidence of incurred medical expenses, and the Court may not order payment of any bills.

*Temporary disability benefits*

To establish entitlement to temporary benefits, Mr. Terry must show he (1) became disabled from working due to a compensable injury, (2) a causal connection between the injury and his inability to work, and (3) the duration of the period of disability. *Jones v. Crencor Leasing and Sales*, TN Wrk. Comp. App. Bd. LEXIS 48, at *7 (Dec. 11, 2015). At this stage, Mr. Terry offered no proof of the required elements, and the Court denies his request for temporary disability benefits.

*Uninsured Employer Fund*

The Bureau has discretion to pay limited temporary disability and medical benefits from the Uninsured Employers Fund to an employee who: 1) worked for an employer who failed to secure payment of compensation; 2) suffered an injury primarily arising in the course and scope of employment on or after July 1, 2015; 3) was a Tennessee resident on the date of the injury; and, 4) "provided notice to the bureau of the injury and of the failure of the employer to secure the payment of compensation within a reasonable period of time, but in no event more than sixty (60) days after the date of the injury[.]" Tenn. Code Ann. § 50-6-801(d)(1)-(4).

7

Based on the evidence, the Court finds Mr. Terry was a Tennessee resident on July 27, 2016, and was an employee of Whaley for purposes of the Tennessee Workers' Compensation Law. As of July 27, 2016, Whaley failed to secure workers' compensation insurance. Mr. Terry suffered his injury after July 1, 2015, and the Court holds he is likely to prevail at hearing on the merits that his injury arose primarily out of and in the course and scope of his employment with Whaley. Mr. Terry provided notice to the Bureau within sixty days of the date of injury by the filing of a Petition for Benefit Determination on September 23, 2016, that described both his injury and noted that Whaley was uninsured.

**IT IS, THEREFORE, ORDERED** as follows:

1. Whaley shall provide Mr. Terry with ongoing medical treatment under Tennessee Code Annotated section 50-6-204(a)(3) with Dr. Murrell. Mr. Terry or Dr. Murrell shall provide the medical bills to Whaley.

2. The Court denies Mr. Terry's requests for all other benefits at this time.

3. This matter is set for a Scheduling (Status) Hearing on **Thursday, November 16, 2017, at 10:00 a.m. Central time. You must call 731-422-5263 or toll-free 855-543-5038 to participate in the Hearing.**

**ENTERED this the 11th day of October, 2017.**

**Allen Phillips, Judge**
**Court of Workers' Compensation Claims**

8

## APPENDIX

Exhibits:

1. Bureau's Expedited Request for Investigation Report
2. Deposition of Teresa Grant
3. Medical Records of Methodist Healthcare
4. Affidavit of Dan Baskin
5. Copies of Mr. Terry's paychecks from Whaley
6. Copy of text message between parties regarding independent mechanic work by Mr. Terry
7. Screenshot of purported advertisement for Mr. Terry's repair business
8. Copy of text message between parties regarding freedom to accept or decline towing job
9. Copy of text message between parties regarding Mr. Terry's report of injury at home on day prior to alleged injury date
10. Page from Bureau Investigative Report detailing past alleged work injuries sustained by Mr. Terry
11. Copy of text message between parties purporting to show personal use of Whaley equipment by Mr. Terry
12. Photograph depicting location of tow truck at scene of alleged accident
13. Copy of Mr. Terry's alleged criminal record
14. Copy of text message between parties purporting to show independent nature of mechanic work performed by Mr. Terry for Whaley
15. Copy of text message between parties purporting to show method of payment for work
16. (Duplicate of Exhibit 14)
17. Photographs of deck of tow truck


Technical record:

1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Request for Expedited Hearing
4. Order Granting Additional Time Following Show Cause Hearing and Denying File Review Expedited Hearing
5. Whaley's Pre-Hearing Statement
6. Mr. Terry's Pre-Hearing Statement

9

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this Expedited Hearing Order was sent to the following recipients by the following methods of service on this the 11th day of October, 2017.

| Name | Certified Mail | First Class Mail | Via Email | Service Sent To: |
|------|------|------|------|------|
| Emily B. Bragg, Esq., Attorney for Employee | | | X | ebragg@forthepeople.com |
| William A. Wooten, Esq., Attorney for Employer | | | X | wawooten@gmail.com |

Penny Shrum, Clerk of Court

**Penny Shrum, Clerk of Court**
**Court of Workers' Compensation Claims**
**WC.CourtClerk@tn.gov**